And we'll move to our fourth case this morning. Jennifer Shirk v. Indiana University Board of Trustees. Ms. Conklin. Good morning. May it please the Court, Anna Conklin for the Plaintiff Appellant, Jennifer Shirk. Jennifer Shirk has presented ample evidence to create an inference that her termination was retaliatory. First, Ms. Shirk presented evidence that the defendant singled out her protected activity in her termination meeting. Second, Ms. Shirk presented evidence that they had been actively looking for a way to get rid of her. Third, Ms. Shirk presented evidence that IU instructed an HR person to lie about the circumstances involving Ms. Shirk's protected activity. Fourth, Ms. Shirk presented evidence that her supervisors assumed she couldn't do her job because she requested accommodations. And fifth, Ms. Shirk presented evidence that her supervisors became angry and viewed it as a performance issue that she, quote, disappeared on FMLA leave. Each time she engaged in protected activity, from the time that she complained she was denied a reclassification request because she took FMLA, the defendants reacted negatively. Ms. Shirk presented evidence that a jury could reasonably find that by the time she escalated a concern about discrimination and retaliation that had been ignored at the levels below, the defendants were so fed up with her protected activities that they terminated her employment. The defendants hold out the emails that Ms. Shirk sent on April 15th and 16th as the sole legitimate non-discriminatory reason for Ms. Shirk's termination. But Ms. Shirk presented evidence that two other employees who contributed to those emails were not fired. One of them was Ms. Kavanaugh, who, like Ms. Shirk, reported to Mr. Zimliak, who made the decision to terminate Ms. Shirk. Ms. Conklin, with regard to that, I was looking at the record to ascertain when Mr. Zimliak found out that Ms. Kavanaugh had assisted Ms. Shirk. Can you enlighten me on the timing of that? It wasn't clear from his testimony whether or not he found out before Ms. Shirk was terminated or after she was terminated. I agree that the testimony is not entirely clear, and from my memory of the testimony, he didn't necessarily know about Ms. Kavanaugh's contribution at the time that he terminated Jennifer Shirk. But the testimony is clear that at some point he did learn that one of his direct reports contributed to the very emails that he says Jennifer Shirk was fired for, and further testified that not only was that employee not terminated, she was not disciplined, and he didn't even have a conversation with her to say, hey, this is inappropriate conduct that my direct reports should not be engaging in. In the due process meeting on April 16th, the defendants singled out Jennifer Shirk's protected activity. Mr. Ng, the HR employee, read aloud the very line of Jennifer Shirk's third email where she alleged she was being discriminated and retaliated against and was raising those concerns. Mr. Ng asked Ms. Shirk why she put that in her email to Mr. Foley. This is undisputed. Then she's told that she's fired for discussing private matters not relevant to services being provided to OOE, Mr. Foley's department, and for sharing disparaging personal opinions of learning technologies leadership with OOE, Mr. Foley's department, that threatens client relationships. Ms. Conklin, assume that Mr. Ng and the company did not point to that middle email. I understand there are three emails, right? Yes. On the 16th. Instead, relied only upon the email that she sent on the 15th as well as the first email that she sent on the 16th. Okay. Would you still have a claim? Yes. That's the argument that the defendants made at the district court level trying to separate the first two emails from the third protected activity email. And I know factually they can't. I'm saying hypothetically speaking, let's talk about an alternative universe where that second and third email was not sent, okay? Would you still have a claim? Yes, because if you back up before that, former HR employee Jim Peltz is testifying that after SSHRC's conversations with management, where SSHRC's managers are conveying that Jennifer SSHRC is being generally disruptive, IU went looking for a reason to terminate her employment. And then if you look at Mr. Zimliak's testimony about what he thought the problem was with the emails, he testifies that the emails are disruptive. So as you can see, the only disruptive activity that Ms. SSHRC could possibly be engaging in is protected activity. That's why her managers are viewing her as a disruptive employee. I thought they thought she was disruptive because she was sending emails, kind of going over their heads and sending emails directly to their client, when that was not really kind of her place or within the scope of her responsibilities to do so. That's the reason the defendants hold out, but when I asked Mr. Zimliak whether it would be appropriate for Jennifer SSHRC to raise a concern if she had an issue with several levels of management to the next leader, he testified that that would be completely appropriate. But the person to whom, and I'm sorry, I forgot the person's name, to whom she directed the email, he wasn't part of their organization. He was, as I understand it, someone in the other part of the university that was the e-learning group's client, right? The defendant characterizes him as a client, but in her termination meeting, Jennifer SSHRC testified that she didn't understand he was a client. She thought that he was the appropriate person to escalate these concerns to. Her boss's boss also thought this was the appropriate person to escalate concerns to. Her client that she was working for testified in an affidavit that she thought this was the appropriate person to escalate concerns to. And nobody, including Mr. Foley, told Ms. SSHRC that he was not the appropriate person to escalate these concerns to. And the standard, Your Honor, on summary judgment is that she's engaging in protected activity when she has a reasonable belief that she's raising concerns and engaging in protected activity under the law. And there's no dispute in the record, Your Honor, that she holds that reasonable belief. I would like to reserve the rest of my time for rebuttal. That's fine. Thank you. Is it Makiya? Excuse me. Makiya. Makiya. May it please the Court. Ms. SSHRC's complaint against IU originally included several claims, including a disability discrimination claim, retaliation claim, failure to accommodate a disability, and a disability-based harassment claim. The district court entered summary judgment on all of those claims in favor of IU and the individual defendants. Now these issues have been narrowed on appeal. There are two specific questions. First, there is an FMLA claim brought against Justin Zemlack in his individual capacity. And the question is whether a reasonable fact finder could conclude that Ms. SSHRC's FMLA leave caused his decision to terminate her employment. The second question is whether a reasonable fact finder could conclude that IU terminated Ms. SSHRC's employment because of any of her protected activities, which were taking FMLA leaves, requesting disability-related accommodations, and making complaints of discrimination and retaliation. The answer to both of those questions is no. There is no causal connection between Ms. SSHRC's FMLA leave or any of her other protected activities and the decision to terminate her employment from IU. So we have a statement by the HR person of the company saying that these are the emails on which we base her termination. One of the emails flatly raises the issue of all of the objections and complaints she had with regard to the way they treated her and a request for FMLA leave. So just from that alone, why couldn't a reasonable jury look at that and say, well, you know, since that's what the company says and they asked her about it during a termination or exit interview, maybe that is one of the reasons. Sure. So I think the timing is important in this. So the first email, as you mentioned before, was sent on April 15th. And after that email, Justin Zemlack was told about that email, and he said that that is something that she was – it was out of bounds for her to do. He said that in a message to her direct supervisor. And then HR was notified right after that email. And then the second two emails were sent on the next day. Her claim of – or I say she – what precipitated the third email is Peter Ermey, her direct supervisor, asked her to send her copies of these emails. So that he could see what she had said. And she said in that third email that she feared retaliation as a result of giving Peter Ermey those emails. So this was already on HR's email – or on their radar by the time that that third email had even been sent. And it was already something that there was a lot of concern around why she would involve a client in this sort of internal dispute that was going on with a problem that was ultimately solved very quickly. So then fast forward to the termination meeting – or due process meeting, because they hadn't made the decision yet. And Mr. Ying testified that he started this meeting by asking her about all of these emails. What was your general intent? Why did you send these? And it wasn't until she brought up that third email that he then said, okay, fine. Why did you ask about this specific – or why did you say this specific thing in your email? And so in his role at HR – now he didn't testify as to why he asked that. He just said that it was in response to her reading that email during the meeting. But in his role at HR, it would be logical for him to ask why she was sending an email about retaliation in that setting. So she also testified – Ms. Shirk testified that she wrote that email, those specific words, to Chris Foley, so that she, quote, so that she would not get fired out of retaliation. So she tried to insulate herself from the other emails that she sent. But as the district court has said in this case, the mere mention of discrimination does not pull a blanket of immunity over the entirety of Ms. Shirk's conduct. Otherwise, any employee could shield even the most outlandish behavior by invoking discrimination at the end of it. Sure, but the relevant inquiry, the salient inquiry, is not what – why Ms. Shirk sent the email. The salient inquiry is why the employer decided to terminate her. And isn't there a letter from Mr. Ying basically saying we're terminating you because of your emails, plural, that you sent on April 15th and the emails that you sent on April 16th, which presumably includes the email where she is raising the issue of retaliation? Then isn't it just – and you ask us to draw the inference that, you know, that's not really why she was terminated. But isn't that a factual question that should go to the jury and have the jury decide that? No, I don't think it is because I don't think that the two decision makers in this – Justin Zemlack was the decision maker, and he made that decision in conjunction with Chris Ying and his support as the HR person. And their testimony is that it wasn't any complaint of discrimination or any fear of retaliation. That third email also – it didn't just have that retaliation fear listed in it. You know, it was a long email, four paragraphs long. So it had other things in there as well. So it's not that – so they testified that she was terminated because of these emails being sent. The fact that she put all of these issues with what she said was Peter Ermey's performance, Justin Zemlack's ability to essentially lead his department. She put those at the forefront of a client, and not just a client, but the biggest client and funding source that her department had. And so Justin Zemlack testified that he talked to Chris Ermey – or, sorry, talked to Chris Foley, and he was concerned about the email. Chris Ying said that he talked to the other individual on the emails, Miss Johnson, Julie Johnson, who was Justin Zemlack's direct supervisor. And she also had a level of concern about, you know, some of the negative that could happen from these emails. So, no, I do not think that it's a question of fact, because I think the record makes clear that it was the act of sending these emails to a client that resulted in the terminable offense. And the fact that this was raised to HR after the very first email was sent, and the fact that Justin Zemlack, in a Slack message, an internal message to Peter Ermey, said that this is completely out of bounds for her to do after that very first email, I think shows that that was the mentality behind the termination decision. So the applicable standard on summary judgment is whether there is sufficient evidence that would allow a reasonable jury to conclude that Miss Shirk's protected activity caused her termination. We do have something of a legal debate about the causation standard here. It wasn't mentioned in your opponent's opening argument, but it is briefed extensively here, and whether the district court used the wrong causation standard. As I understand the case to be narrowed on appeal, we have two retaliation claims, one under the FMLA and one under the Rehabilitation Act. So it's purely the retaliation causation standard, which is not the sole cause for an affirmative disparate treatment discrimination claim under the Rehabilitation Act, but for causation standard, a substantial motivating factor for the termination decision for a retaliation claim. The motivation was to retaliate against her because of her disability or FMLA-protected activity. When the judge got to the retaliation claims, the decision remains a little muddled, and perhaps you can shed some light on that. Sure, yes. So he does set forth the proper standards of all of the claims on pages 11 and 12 of his order, but then you are right. There is an area in the order where the court does analyze both the discrimination claim and the retaliation claim under the Rehab Act together, and then concludes that her disability or protected activities were not the, quote, sole reasons of her termination. But even so, it would amount to reversible error, even if he did articulate that legal standard incorrectly. It would amount to reversible error only if Ms. Shirk could also show that summary judgment was unwarranted, and that's what we say she cannot do. Because in the district court's order, it holds that Ms. Shirk introduced no evidence to connect the termination decision with her protected class or activity. And so the court made clear that even the slightest causal connection under any standard was not found and granted summary judgment on that basis. I kind of expected you to say that because our standard of review is de novo, we can basically ignore that misstep by the district court. Well, so I do think that because your standard of review is de novo, it's not reversible error. You don't have to remand it back. And I think the stronger argument there is that the district court, he did say that there was no connection there. And so if this court agrees that there's no causal connection between the evidence put forth by Ms. Shirk and her termination, then remand would not be necessary here because he did say there was no causal connection. And I see that I'm already out of time, so unless you have any other questions, I'll conclude. Thank you very much. All right. Thank you very much. Ms. Conklin, you had a little time left. Your Honor, I agree with the Defendant's counsel that the timing here is important. Mr. Zimliak is notified of the email and forwards it to HR. But Ms. Shirk is not called into a due process meeting then, not after the first email on April 15th. She sends another email on April 16th and then an email that is clearly protected activity on April 16th. It is only after that third email that HR calls Ms. Shirk into the due process meeting, which it says was so urgent that it couldn't provide more than 30 minutes' notice. The problem is that this entire email exchange had to do with a funding shortfall in the unit, and she took it onto herself to report that to the top of the food chain. And that was improper, bypassing numerous layers of supervision. And it was only until the very end, when she knew she was in trouble for doing that, that she injects the issue of her disability and hostile work environment as an afterthought, bootstrap kind of a thing. That's a pretty slim read to get to a jury on. That's one interpretation of the evidence that draws the inferences in favor of the Defendant, which is not appropriate on summary judgment. I'm just looking at the record as a whole. So the Defendant takes out of context Ms. Shirk's quote that she put that in her email so she would not get fired out of retaliation. She was concerned about Mr. Ermey firing her out of retaliation because he's requesting her emails. She's not putting this in her email so that if she gets called into a due process meeting, she's not going to get fired out of retaliation because she used the magic words in her email. Does that make any sense as an explanation for dropping that completely unrelated issue into an email chain with the top brass? It has to make some sense. She testified to her reasonable belief that Mr. Foley was the next person in line, and she testified that she had already gone to Ms. Johnston. Mr. Foley is a client, and she's got many layers of supervision above her. But she had already gone to Ms. Johnston, who was the next level above Mr. Zimliak, and Ms. Johnston told her, I cannot help you because of my interim position. So who else is she supposed to go to? She goes to the person who she reasonably believes is the next person in line, and that reasonable belief supported by other supervisors below is what makes her activity protected. Thank you. All right, thank you very much. Our thanks to all counsel. The case is taken under advisement.